UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ALEXANDRIA A. TATE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4: 18 CV 786 DDN |
| | ) |
| ANDREW M. SAUL,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Alexandria A. Tate for supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381-1385. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the final decision of the Commissioner is affirmed.

## **I. BACKGROUND**

Plaintiff was born on January 15, 1992 and was 23 years old at the time of her application. (Tr. 34.) She filed her application on January 20, 2015, alleging a May 16, 2014, onset date, and alleging disability due to bipolar disorder, hypertension, hip problems, high blood pressure, asthma, and major depressive disorder. (Tr. 68, 120.) Her application was denied, and she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 69-73.)

---

[1] The Court takes judicial notice that on June 4, 2019, Andrew M. Saul was confirmed as Commissioner of Social Security. *See* https://www.congress.gov/nomination/116th-congress/94. Pursuant to Federal Rule of Civil Procedure 25(d), Commissioner Saul is substituted for Nancy A. Berryhill as defendant in this action. No further action needs to be taken to continue this suit by reason of 42 U.S.C. § 405(g) (last sentence).

On August 8, 2017, following a hearing, an ALJ issued a decision finding that plaintiff was not disabled under the Act. (Tr. 10-21.) The Appeals Council denied her request for review. (Tr. 1-4.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. ADMINISTRATIVE RECORD

The following is a summary of plaintiff's administrative record relevant to this judicial review.

Throughout the relevant period, plaintiff was diagnosed with bipolar affective disorder, Type I. (Tr. 444, 497.) Her bipolar history included several inpatient hospitalizations, the earliest one being an apparent suicide attempt when she jumped off a bridge when she was nine years old. (Tr. 249, 252, 254, 260, 262, 392-95.) Plaintiff also had a very recent history of severe cannabis use disorder and was repeatedly diagnosed with severe tobacco use disorder. During the relevant period plaintiff was morbidly obese. In October 2015, plaintiff was 5 feet 9 inches tall, weighed 358 pounds, and had a body mass index of 52.87. (Tr. 333-35.)

Plaintiff received mental health treatment at BJC Behavioral Health from July 24, 2014 through October 9, 2016. Her medications included antipsychotics, antidepressants, and mood stabilizers. (Tr. 225-67, 410-508.)

From March 2015 through October 2016, mental status examinations revealed that her concentration and memory were consistently intact. (Tr. 410-508.)

In July 2014, plaintiff's psychiatrist noted that she had limited motivation to attend the Independence Center, a rehabilitation center. On August 2014, plaintiff arrived at a therapy appointment about 30 minutes late and was advised of the importance of being on time. She had recently attended a concert and a play with a group from the Independence Center. (Tr. 226-27.) In September 2014, plaintiff's caseworker noted she was often distracted and that plaintiff reported being absent minded and lacking motivation. She

believed plaintiff needed support in identifying the barriers to her ability to focus at school. (Tr. 239, 244.)

By October 2014, plaintiff's goals for the year included attendance at therapeutic services, such as group therapy, the Independence Center, and caseworker and psychiatric appointments. (Tr. 244-45.)

In February 2015, after evaluating plaintiff's medical records, state agency expert Marsha Toll, Licensed Clinical Psychologist, opined that plaintiff was moderately impaired in maintaining concentration, persistence or pace. She further opined that plaintiff was not significantly limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 58-64.)

At a September 29, 2015 appointment, plaintiff was excited about starting a new temporary job at a Salvation Army call center. She discussed the safety issues regarding her 100 minute one-way commute that would involve several bus transfers. After two weeks on the job, plaintiff was terminated after she received four warnings in a one-week period. On one occasion plaintiff missed her morning medications, became dizzy, and needed to leave work early. She called in sick on another occasion. Her therapist noted her termination was a source of shame and disappointment for her. (Tr. 433-36.) In April 2015, plaintiff's caseworker reported plaintiff had been attending GED classes four days per week for two years. However, by November 2015, she was no longer attending GED classes. (Tr. 167, 229, 443.)

Plaintiff's mood was "down" at an October 27, 2015 appointment. She had run out of her antidepressant medication several days earlier and was upset that her father, a bedridden paraplegic with a history of anger and aggression, was being abusive to her and her stepmother. (Tr. 436-37.) At a November 24, 2015 appointment, plaintiff felt sad because she no longer had the same caseworker. She was also still upset about her father's verbal abuse. (Tr. 439.)

At a December 29, 2015 appointment, plaintiff described her mood as "fine." However, she reported both her father and stepmother were suffering from depression and the depressive atmosphere at home was overwhelming at times. She continued to enjoy spending time with her dog and boyfriend. Her psychiatrist noted plaintiff had daily mood lability or exaggerated changes in mood. She had stopped GED classes and had poor motivation and severe fatigue associated with despair and indecisiveness. (Tr. 443-44.)

On January 5, 2016, plaintiff reported feeling "significantly better" one week after starting lithium. She reported increased energy and motivation and was enjoying cleaning her house, spending time with her boyfriend, and talking with him on the phone late into the night. Her mood was "better" and her affect was euthymic or stable. (Tr. 447-48.)

At her next appointment two weeks later, plaintiff complained of mood swings that began after her boyfriend revealed that he had herpes after he had denied having any sexually transmitted diseases. Her mood was "sad." (Tr. 451-52.)

On February 16, 2016, plaintiff was "doing good" after reconciling with her boyfriend, although his dishonesty continued to bother her. Her mood was "okay." On March 1, 2016, plaintiff reported her depression as "being up and down" but "getting better," and described her mood as "fair." (Tr. 455-62.)

Plaintiff was "doing alright" on March 8, 2016, when she appeared for an unscheduled appointment. She had received a text message from a cousin who had reportedly stolen money from her grandmother's estate. Her family was angry with the cousin because the money was part of an inheritance that was being used to pay for her private school. Her mood was "fair." (Tr. 465-66.)

The following week, plaintiff's mood was labile or changeable after not hearing back from the same cousin. She was also upset and angry with the way her father treated her stepmother. Her mood was "fair." Plaintiff was attending the Independence Center

once a week, as well as other mental health services at BJC Behavioral Health twice a week. (Tr. 443, 465-70.)

At her next appointment on March 22, 2016, plaintiff was "up and down" due to problems with her boyfriend's grandmother, whom he lived with. Her mood was "pretty good." (Tr. 474-75.)

The following week, plaintiff was coping with the anniversary of her biological mother's death. She had spent the weekend with her boyfriend and enjoyed herself. Her mood was "pretty good." At an April 5, 2016 appointment, her mood was "good." (Tr. 478-82.)

On May 10, 2016, plaintiff reported increased anxiety due to disagreements with her boyfriend. Despite this, she continued to socialize with him and other friends. (Tr. 486.)

At a May 31, 2016 appointment, plaintiff was worried and angry. Her father continued to be abusive to her stepmother, and her boyfriend's grandmother was being insulting to her. She continued to spend time with her boyfriend, as well as attend church. (Tr. 491.)

On June 21, 2016, plaintiff's mood was somewhat labile with crying spells. Her father's emotional and verbal abuse had improved, however. Her mood was "fine." (Tr. 495-96.)

Plaintiff saw Erica Buchalter, M.D., a psychiatrist, on August 10, 2016. Dr. Buchalter indicated that in the past plaintiff had been stable while taking lithium, but that she had stopped taking it for unknown reasons. Plaintiff did well once she was restarted on lithium. Plaintiff had just broken up with her boyfriend and had reported depressive symptoms since then. Plaintiff also cared for her disabled father. She was able to enjoy walking her dog and going out with friends. Plaintiff rated her mood at 7/10 that day and said it would be better if her body did not hurt. Her affect was euthymic. (Tr. 499-501.)

At a September 7, 2016 appointment, plaintiff described her mood as "up and down depressed, but not as bad as it used to be." (Tr. 504.)

Plaintiff had eighteen scheduled therapy appointments between September 2015 and June 2016. When accompanied by a case worker, plaintiff was early or on time four times. When attending therapy by herself, she was on time for nine sessions and late for three others. Plaintiff missed one appointment entirely because she started her day erratically and was running late. Another time she arrived on the wrong day for an appointment. (Tr. 430-95.)

In August 2016, plaintiff's therapist noted she was attempting to attend one group therapy session per week, but had not done so for one month. She was also attempting to return to school. Plaintiff's goals for the rest of the year included attending mental health services multiple days each week. Plaintiff stated that she would like to work, but is unsure if she could keep a job at this time. She stated that her job at the call center did not work out due to the long commute on public transportation. (Tr. 500, 509, 511-12, 516.)

Plaintiff has a limited work history with posted earnings only in 2015. All of her work history was related to some form of vocational rehabilitation program. (Tr. 40-41, 129-32, 516.)

**ALJ Hearing**

On January 19, 2017, plaintiff appeared and testified to the following at a hearing before an ALJ. (Tr. 26-54.) Her bipolar condition involves extreme "lows" making it difficult for her to interact with people, get out of bed, or bathe. She worked for four months in a vocational rehabilitation program assisting the elderly, and her boss there was understanding about her need for days when she did not come to work. Her bipolar condition makes it difficult to arrive on time or remain at the workplace all day. She had

difficulty working even four-hour shifts because there were times when she had to go home. (Tr. 39-42.)

She attempted to work at a call center, but was terminated after being "written up" four times during a two-week period for attendance issues. (Tr. 42-47.)

She is trying to attend mental health services several days per week, although there are weeks when she can't go and misses it completely. She has attempted to earn her GED, but has been unsuccessful due to concentration and attendance problems. She spends a lot of time in bed and watches a lot of TV. (Tr. 43-48.)

A vocational expert (VE) also testified at the hearing. (Tr. 50-53.) The ALJ asked the VE to consider a hypothetical individual limited by what she would later find to be plaintiff's residual functional capacity (RFC), but without attendance or punctuality impairments. The VE responded that such a person could work in a significant number of jobs, specifically as a janitor, dining and cafeteria attendant, and small product assembler. (Tr. 51-52.)

The ALJ then asked the VE whether there were jobs available for someone who could conform to a normal work schedule for only one third of the time, while two thirds of the time would be unavailable in a work place. Plaintiff's attorney then asked the VE to consider a limitation of missing two days of work per month, unscheduled, on a consistent basis. The VE responded that no jobs would be available under either scenario. (Tr. 52-53.)

The ALJ requested post-hearing opinion evidence from Michael Cremerius, Ph.D., a medical expert, by way of written interrogatories. The interrogatories did not address absenteeism or punctuality resulting from bipolar disorder. (Tr. 562-80.) Dr. Cremerius responded, opining, among other things, that plaintiff was moderately limited in concentrating, persisting, or maintaining pace, and in responding appropriately to usual work situations and to changes in a routine work setting. (Tr. 584, 590.)

The ALJ proffered the letter to Dr. Cremerius to counsel, along with his response, and invited written comments or questions to be sent to the author of the new evidence. The ALJ noted that counsel could request the ALJ issue a subpoena to require the submission of records and that she would issue a subpoena if reasonably necessary for the full presentation of the case. Counsel proffered additional interrogatories addressing absenteeism and punctuality. (Tr. 185-86, 188.)

### III.  DECISION OF THE ALJ

On August 8, 2017, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 10-21.) At Step One, the ALJ found that plaintiff had not performed substantial gainful activity since January 20, 2015, her application date. At Step Two, the ALJ found that plaintiff had the severe impairments of obesity and bipolar disorder. However, the ALJ found plaintiff did not have an impairment or combination of impairments listed in or medically equal to one contained in the Listings, 20 C.F.R. part 404, subpart P, appendix 1. (Tr. 12-13.)

The ALJ determined that plaintiff retained the residual functional capacity to perform "light" work with the following limitations. She could only occasionally climb ramps and stairs, stoop and crouch. She could never climb ladders, ropes or scaffolds, kneel or crawl. She could have only occasional exposure to vibration as well as extremes of cold and no exposure to hazards such as unprotected heights and dangerous machinery. In addition, plaintiff could only perform simple, routine tasks in an environment where contact with supervisors, co-workers, or the general public was only occasional. (Tr. 15.)

At Step Four, the ALJ found that plaintiff had no past relevant work. At Step Five, the ALJ found there were jobs that exist in significant numbers in the national economy that plaintiff could perform, including work as a janitor, dining and cafeteria attendant, and small product assembler. (Tr. 20.) The ALJ therefore concluded that plaintiff was not "disabled" under the Act. (Tr. 20-21.)

## IV.  GENERAL LEGAL PRINCIPLES

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings apply the relevant legal standards to facts that are supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.*  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing five-step process).

Steps One through Three require the claimant to prove: (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment; and (3) her condition meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW).  Id. § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating

she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to her PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V.  DISCUSSION

Plaintiff argues the ALJ erred (1) in failing to allow counsel to question medical expert Dr. Cremerius about attendance or punctuality restrictions, depriving her of due process; (2) in failing to include attendance or punctuality restrictions in her RFC; and (3) in failing to consider the significance of her past work attempts as having been within vocational rehabilitation programs.

**1.  Denial of Due Process in Failing to propound Interrogatories to Medical Expert**

Plaintiff argues the ALJ erred in failing to allow counsel to question medical expert Dr. Cremerius, thus depriving her of due process. She argues the record lacked the opinion of a medical expert concerning her rate of absenteeism resulting from her bipolar disorder. The Court disagrees.

In her opinion, the ALJ stated she ultimately determined that issuance of a subpoena concerning the questions posed by counsel was unnecessary, because even if Dr. Cremerius had answered most of the questions favorably to plaintiff, it would not have changed her decision. (Tr. 10.) See 20 C.F.R. § 416.927.

The ALJ determined that the record evidence did not support a finding that plaintiff's impairments would result in chronic absenteeism or inability to complete a workday. (Tr. 13.) Specifically, none of plaintiff's treating sources ever indicated that her bipolar disorder would cause attendance problems. The ALJ determined that

plaintiff's subjective statements to that effect were not consistent with the record. (Tr. 10.) Plaintiff also routinely attended counseling appointments by herself. (Tr. 433, 436, 439, 447, 451, 455, 461, 474, 478, 482, 486, 495.) This court concludes the record evidence does not support plaintiff's assertion that she would routinely be late to work from the fact that she was sometimes late for therapy appointments over the course of two years.

In support, plaintiff largely relies on Montgomery v. Berryhill, 2018 WL 3971949 (E.D. Mo. August 20, 2018). However, Montgomery is distinguishable. As an initial matter, the Montgomery court noted several times that its decision was made based on the circumstances and record of that case. Most importantly, the Montgomery court found it significant that the ALJ afforded the post-hearing medical opinion "great weight" and that it was the primary evidence relied on in the decision to deny benefits. 2018 WL 3971949, at *4.

Here, the ALJ afforded the opinion of Dr. Cremerius only partial weight, as she did for Dr. Toll, and instead largely relied on the findings of plaintiff's medical providers. (Tr. 19.) Therefore, Dr. Cremerius's opinion was not the primary evidence relied upon by the ALJ. Also, the ALJ addressed the interrogatories posed by plaintiff and outlined the reasoning behind her decision based on the assumption that Dr. Cremerius had answered the questions in a manner supporting a finding of disability due to severe problems with work attendance. (Tr. 10.)

Plaintiff also takes issue with the ALJ's record support for her finding that plaintiff stopped working for reasons other than attendance problems. However, the ALJ's reasoning is supported by two record citations that describe plaintiff's difficulty with her 100-minute commute. (Tr. 433, 435, 516.) And contrary to plaintiff's argument, the ALJ's statement that plaintiff quit school for financial reasons is supported by the record. Plaintiff stated to her counselor that a cousin stole her inheritance, requiring her to leave a private school. (Tr. 19, 465, 469.)

## 2. Attendance and Punctuality Limitations Relating to RFC

Plaintiff next argues the ALJ erred in failing to include attendance and punctuality restrictions in her RFC. The Court disagrees.

The record evidence showed, as the ALJ referenced, that plaintiff had transportation issues during the relevant period that led to absences, resulting in the loss of a job through vocational rehabilitation. (Tr. 10, 435, 516.) Absenteeism due to transportation issues is not a basis for limitations in the RFC. As an initial matter, there may be a number of reasons why plaintiff could have been late to appointments that are not sufficient to support including an absenteeism limitation in her RFC. As long as the ALJ's finding in this regard is within the "zone of choice" it must be affirmed. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).

Plaintiff's argument rests largely on her own subjective reports about her symptoms. For several reasons, the ALJ found plaintiff's subjective complaints were not supported by the record as a whole. Dr. Toll, a State agency psychologist, opined that plaintiff was not significantly limited in the area of sustaining an ordinary routine without special supervision and that she could complete a normal workday and workweek. (Tr. 19, 63.) There was no opinion evidence from any treating source contradicting Dr. Toll's opinion. This opinion evidence supported the ALJ's finding that plaintiff would not experience chronic absenteeism. See 20 C.F.R. § 416.927; Social Security Ruling (SSR) 96-8p.

The record evidence also shows that plaintiff's bipolar disorder was fairly well controlled. As the ALJ discussed, plaintiff's concentration and memory were consistently intact. (Tr. 13, 410, 416-34, 437-48, 452-56, 462-66, 470-75, 479-83, 487, 496, 501-07.) Plaintiff's mood was generally "pretty good" or euthymic. (Tr. 410, 415, 420, 430, 434, 444, 448, 475, 479, 483, 496, 501.) These mental status findings did not suggest disabling limitations. See 20 C.F.R. § 416.902(l).

Plaintiff did experience an episode of exacerbation in 2015 when she was taken off lithium. However, Dr. Buchalter indicated that she improved once she restarted on lithium. (Tr. 444-49, 499.) Additionally, when plaintiff's mood was dysthymic or depressed, it was generally in response to situational stressors, specifically, conflicts with her boyfriend or father. (Tr. 437, 439, 452, 455, 466, 486, 491.)

Further, despite plaintiff's testimony that she often had difficulty getting out of bed or bathing, the record evidence shows a normal range of daily activities for an unemployed young person living with her parents. (Tr. 14, 16-17.) The ALJ observed that plaintiff had a long-term boyfriend and that she went out with him and other friends. (Tr. 14, 17, 422, 430, 433, 443, 447, 486, 491, 500.) Plaintiff spent her days watching television and walking and playing with her dog, despite her testimony to the contrary. (Tr. 16-17, 19, 46, 424, 430, 443, 500.) Plaintiff could cook, perform household chores, drive, and use public transportation without assistance. (Tr. 14, 133-35.) Despite her testimony that she sometimes spent all day in bed, plaintiff also indicated that she slept for seven to nine hours a night and did not nap during the day. (Tr. 424, 430, 439, 447.) Plaintiff's allegations that she had difficulty bathing and grooming were inconsistent with her presentation during counseling when she was always appropriately dressed and groomed. (Tr. 14, 430, 434, 436, 439, 444, 448, 451, 456, 461, 466, 470, 474-75, 478-79, 483, 487, 492, 495-96, 501, 503, 506, 545.) Plaintiff also helped care for her disabled father. (Tr. 433, 439, 500.) Therefore, the ALJ properly acknowledged the inconsistencies between plaintiff's daily activities and her subjective reports.

The ALJ also found plaintiff's testimony that she experienced ongoing medication side effects was not supported by the record. (Tr. 18, 36-37.) In December 2015, plaintiff reported side effects from lamotrigine, used to treat bipolar disorder, and it was promptly discontinued. (Tr. 442.) Otherwise, she routinely denied side effects from her medication. (Tr. 410, 412, 424, 444, 448, 452, 456, 462, 466, 470, 475, 479, 483, 487, 492, 496).

The ALJ also considered plaintiff's reasons for leaving her previous jobs. (Tr. 19.) Plaintiff reported that she quit one job because it did not pay well and another because of the long commute. (Tr. 10, 435, 516.) Another job involved a temporary summer program. (Tr. 41.) Although plaintiff testified that she quit school because of her depression, the record evidence shows that she did so because of her inability to afford the private school tuition. (Tr. 19, 34, 465, 469.)

For all of these reasons, the ALJ reasonably concluded that she could not accept plaintiff's subjective belief that she would routinely miss work due to her impairments. (Tr. 18-19.) **See** *Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016) (determinations about the consistency of a claimant's subjective reports with the record are the province of the ALJ, and as long as good reasons and substantial evidence support the ALJ's evaluation, courts will defer to the ALJ's decision). *See Nash v. Comm'r., Soc. Sec. Admin.*, 907 F.3d 1086 (8th Cir. 2018) (hypothetical question may exclude limitations the ALJ finds inconsistent with other record evidence). *Cf. Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) (ALJ properly omitted from hypothetical question an alleged need to miss five workdays a month because such a limitation was unsupported by the record evidence). The Court concludes the ALJ did not err in not including attendance or punctuality limitations in plaintiff's RFC.

### 3. Plaintiff's Past Work Attempts

Plaintiff finally argues the ALJ erred by failing to consider the significance of plaintiff's past work attempts as having been within the vocational rehabilitation or training programs. This Court disagrees.

The ALJ properly determined that plaintiff had no past relevant work. Therefore, the ALJ was not required to consider whether plaintiff performed any of her past work under special conditions to determine whether it could be the basis of a Step Four decision. Instead, the ALJ proceeded to Step Five and made a finding she could perform

other jobs that exist in significant numbers in the national economy. Accordingly, there was no error of law.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.


      /s/ David D. Noce      
**UNITED STATES MAGISTRATE JUDGE**

Signed on July 15, 2019.